SO ORDERED.

SIGNED this 27th day of August, 2018.



_____
Robert E. Nugent
United States Bankruptcy Judge

_____

DESIGNATED FOR ONLINE PUBLICATION

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| IN RE:<br><br>RONALD LEE NOVAK<br>BETH MARIE NOVAK,<br><br>                Debtors. | Case No. 17-11978<br>Chapter 12 |
| IN RE:<br><br>FIRST NATIONAL BANK AND<br>TRUST,<br><br>                Plaintiff,<br><br>vs.<br><br>RONALD LEE NOVAK, BETH<br>MARIE NOVAK, AND GREGORY H.<br>THOMAN TRUST,<br><br>                Defendants. | Adv. No. 17-5152 |

**MEMORANDUM OPINION**

1

Letting your financing statement lapse is a fatal error when junior secured parties are lurking. The lapse "unperfects" the security interest the financing statement was filed to protect. The Gregory H. Thoman Trust perfected a security interest in the farm equipment and vehicles that it sold to Ronald Novak, but let its financing statement lapse. That allowed Novak's farm lender, the First National Bank and Trust, to vault into first place on nearly all the seller's collateral, including the insurance proceeds of a burnt-up grinder, even before Novak filed this case. Nothing in the Trust's Contract for Sale of Business Assets changes this result. Neither does the Trust's alleged repossession and lease-back of the equipment to Novak. The Bank is entitled to summary judgment on its complaint that its security interests in Ronald Novak's personal property, including the insurance proceeds, is a valid and perfected first lien.[1]

Summary Judgment Standards

A motion for summary judgment may be granted where the movant shows that no genuine dispute as to any material fact exists and the movant is entitled to judgment as a matter of law on those uncontroverted facts.[2] Facts are material if they are essential to the proper disposition of the claim under the applicable law and a fact is genuinely disputed if there is sufficient evidence from which the trier of fact could resolve the issue for the non-movant.[3] In reviewing the factual record,

---

[1] First National Bank and Trust appears by its attorney Patricia A. Reeder. The Gregory H. Thoman Trust appears by its attorney David G. Arst.
[2] Fed. R. Civ. P. 56(a) as incorporated in adversary proceedings by Fed. R. Bankr. P. 7056.
[3] *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

**2**

the Court must draw all reasonable inferences in favor of the non-movant.[4] The moving party has the initial burden to demonstrate the absence of genuine disputes of fact by reference to materials in the record -- pleadings, depositions, discovery responses, or affidavits.[5] The non-movant must specifically controvert each of the movant's statements of material fact with like reference or citation to the record or the fact may be deemed "undisputed," or "admitted."[6] Even if the movant's facts are deemed admitted, the movant must demonstrate, based upon those facts, that it is entitled to summary judgment as a matter of law.[7]

Findings of Fact[8]

In January of 2011, the Thoman Trust and Ronald Novak signed a Contract for the Sale of Business Assets (the "Contract") under which Novak agreed to purchase a line of harvesting and hay equipment (the "Collateral"), along with 2,000 round alfalfa bales, growing crops on leased ground, and "feedlot contracts" for $683,300. Novak was to pay $100,000 cash and provide a promissory note for the balance. In return, he received a bill of sale for the Collateral, giving him title and ownership of the Collateral. Novak granted the Trust a security interest in the Collateral to secure repayment of the note. The Trust filed a financing statement with the Secretary of State's office on January 14, 2011 perfecting its security

---

[4] *Adler v. Wal-Mart Stores, Inc.,* 144 F. 3d 664, 670 (10th Cir. 1998).
[5] Fed. R. Civ. P. 56(c)(1) and (4); D. Kan. L.B.R. 7056.1(a) and (d).
[6] Fed. R. Civ. P. 56(c)(1) and (e)(2); D. Kan. L.B.R. 7056.1(a), (b) and (d).
[7] Fed. R. Civ. P. 56(e)(3); *Reed v. Bennett,* 312 F.3d 1190, 1195 (10th Cir. 2002).
[8] The parties stipulated to most, if not all, of the controlling facts in the Pretrial Order, Doc. 81. In both its initial response, Doc. 98 (filed after a 14-day extension of the customary 21-day response period), and its supplemental response of case law citations, Doc. 99, the Trust did not address or properly controvert any of the Bank's statement of uncontroverted facts. *See* D. Kan. L.B.R. 7056.1(b). They are taken as true, *see* Fed. R. Civ. P. 56(e)(2) and D. Kan. L.B.R. 7056.1(a).

3

interest in the Collateral. The financing statement listed each item of Collateral that had been sold to Novak, including a "Tro grinder [Model No.] 5100."

By the time Novak filed bankruptcy on October 10, 2017, he still owed the Trust $211,000.[9] He also owed the Bank more than $840,000, representing borrowings beginning in December of 2013. To secure that debt, Novak gave the Bank security interests in all his assets, including the Collateral. The Bank filed a financing statement on January 7, 2014 indicating "All equipment; All crops/farm products/government payments; All inventory; All Accounts" were secured to the Bank and also noted its name on the certificate of title to a Ford F550 truck that was part of the Collateral. Novak made a series of notes, refinancings, and security agreements to the Bank from January of 2014 through December of 2015.

One item of the Collateral, a tub grinder, burned up in a fire around Halloween, 2016. Novak's casualty insurer, Nationwide, first issued a claim check to Novak and Greg Thoman individually. It then cancelled that check and replaced it with one written on February 8, 2017 payable to Novak, Thoman, and the Bank. Novak had designated both Thoman and the Bank as "loss-payees" on the policy. During this adversary proceeding, I directed that the check be negotiated and deposited in the Court's registry at interest pending the outcome of this adversary proceeding. The amount of the check is $140,000.00.

The Trust did not file a continuation statement for its financing statement. It lapsed on January 14, 2016, five years after its statement's original filing date; the

---

[9] *See* Claim 16-1.

Bank's financing statement was active, having been filed approximately three years (January 7, 2014) after the Trust's. Thus, when Novak filed his chapter 12 case in October of 2017, only the Bank had a "live" financing statement on file covering the Collateral. The Bank also retained its lien notation on the Ford truck title. Five other items of rolling stock sold under the contract remain, but two (a Wilkins trailer and an IHC grain truck) are untitled, one has been junked, and the remaining two vehicles, a Freightliner Classic and a Wilkens trailer, are titled in RBC Hay LLC subject to liens in favor of Tnt Alfalfa Farms, Inc. Neither RBC nor Tnt is a party to this adversary proceeding. The forgoing, along with the entirety of the Bank's list of uncontroverted facts and those facts stipulated to in the Pretrial Order are established for the purposes of this proceeding.[10]

In its counter- and cross-claims, the Trust claims that after Novak defaulted on his obligation to secure his Collateral in January of 2015, it repossessed the Collateral with Novak's agreement and leased it back to him. In support, the Trust offered Greg Thoman's affidavit that, on January 30, 2015, he told Novak that if the Collateral was not insured, the Trust would take it back and lease it to Novak. The Bank and Novak both denied that allegation in their answers and the Bank's affidavit, which is uncontroverted, represents that the Bank had no knowledge of the Trust's allegations of Novak's default or that the contract had been "cancelled" until this litigation began. Nothing in the record, not even in the Trust's proposed

---

[10] *See* Fed. R. Civ. P. 56(g).

surreply, supports a factual conclusion that the Trust took the necessary actions to effectuate and complete a non-judicial foreclosure of its security interests.

Analysis

This is a straightforward secured transactions case requiring application of some basic rules. Article Nine of the Revised Uniform Commercial Code as adopted in Kansas governs the creation, attachment, perfection, and enforcement of security interests in personal property in Kansas.[11] Personal property that is subject to Article Nine's provisions includes the casualty insurance claim payments resulting from damage to or destruction of a secured party's collateral.[12] Section 9-102(a)(64) of the Kansas UCC defines proceeds as, among other things, "insurance payable by reason of the loss …or damage to, the collateral."[13]

A secured party's interest in collateral attaches when the party gives value, the debtor has rights in the collateral, and the debtor authenticates a security agreement that describes it. That agreement is then enforceable between the secured party and the debtor.[14] The attachment of a security interest in collateral also gives the secured party rights to proceeds of the collateral.[15] The secured party perfects a security interest in tangible personal property by filing a financing statement that describes the collateral with the office of the Secretary of State.[16] If

---

[11] KAN. STAT. ANN., Art. 9, Revisor's Note (2000), § 84-9-101, Official UCC Comments (2017 Supp.), and § 84-9-109(a)(1) (2007 Supp.).
[12] KAN. STAT. ANN. § 84-9-315(a)(2), (c), and (d) (2017 Supp.) (continuation of security interest in proceeds of collateral that was perfected by a filed financing statement covering the original collateral).
[13] KAN. STAT. ANN. § 84-9-102(a)(64)(E) (2017 Supp.).
[14] KAN. STAT. ANN. § 84-9-203(a) and (b) (2017 Supp.).
[15] *Id.* at § 84-9-203(f)
[16] KAN. STAT. ANN. § 84-9-310(a) (2017 Supp.).

**6**

the property is covered by a certificate of title, the security interest is perfected by complying with the applicable provisions of the title statute (as applicable here for the debtor's Ford F550 truck, the motor vehicle code), and particularly, KAN. STAT. ANN. § 8-135 (2017 Supp.).[17] If a secured party has a perfected security interest in personal property, that perfected security interest extends to the identifiable proceeds of the collateral and continues as long as the security interest in the underlying collateral is perfected.[18]

Conflicting security interests in the same collateral rank according to the priority in time of their perfection and a security interest in the property's proceeds is perfected at the same time the security interest in the property was first perfected.[19] If there are conflicting security interests in the same collateral, but one is perfected and one is unperfected, the perfected security interest has priority.[20] Once filed, a financing statement remains effective for five years from the date of filing unless the secured party files a continuation statement prior to the expiration of that period.[21] If the party fails to file a continuation statement, the financing statement lapses and the security interest becomes unperfected and is deemed never to have been perfected.[22]

When the Trust sold the Collateral to Novak and received an authenticated security agreement granting it a lien that secured his repayment of the note, its

---

[17] KAN. STAT. ANN. § 84-9-311(a)(2) (2017 Supp.).
[18] KAN. STAT. ANN. § 84-9-315(c) and (d) (2017 Supp.).
[19] KAN. STAT. ANN. § 84-9-322(a)(1) and (b)(1) (2017 Supp.).
[20] KAN. STAT. ANN. § 84-9-322(a)(2) (2017 Supp.).
[21] KAN. STAT. ANN. § 84-9-515(a) (2017 Supp.).
[22] *Id.* at § 84-9-515(c).

7

security interest attached to the Collateral, including the grinder. The Trust perfected that interest on January 14, 2011 when it filed its financing statement. The Bank filed its financing statement on January 7, 2014. From that date until the Trust's financing statement lapsed, the Trust had first priority in the Collateral and the Bank had second priority. But when the Trust's financing statement lapsed on January 14, 2016, the Bank took first position and the Trust's lien became unperfected by operation of § 84-9-515(c). Thus, when the grinder burned in October of 2016, the Bank had the only perfected lien in the grinder and therefore had the first lien in the insurance proceeds under § 84-9-322(a)(2).

The Trust initially raised a plethora of defenses to the Bank's claims of priority, but, in its Response, boiled those down to three: (1) that when Novak defaulted by failing to keep the collateral insured, the terms of the contract provided for the property to revert to the Trust, albeit subject to the Bank's perfected lien;[23] (2) that when the property reverted, the Trust leased it back to Novak for consideration; and (3) that, regardless of the Bank's lien priority, the Trust's "loss-payee" status on Novak's insurance grants it pari-passu priority with the Bank in the grinder's proceeds. Though the Trust did not propose any "uncontroverted facts" to support these defenses, its Response contains several factual allegations about them.

The Trust's "contract terms" theory is based on § 17 of the Contract. That clause provides that if the purchaser (Novak) failed to comply with the terms of the

---

[23] *See* KAN. STAT. ANN. § 84-9-315(a)(1) (security interest survives sale, lease, or other disposition of collateral).

8

Contract, it became null and void and the Bill of Sale as well as any funds paid in by Novak before closing would be retained by the seller. The Trust relies on UCC § 2-401(1)'s provision that title passes under any terms agreed to by the parties to argue that § 17 of the Contract made the passage of the Collateral's title to Novak conditional on his continuing performance.[24] But this argument ignores facts to which the Trust stipulated. Novak closed the sale, making a promissory note and granting a security interest in the Collateral to the Trust, and received a Bill of Sale of the Collateral in exchange. Section 17 of the Contract provided the Trust's remedies before the closing, not after, and merged into the bill of sale. Section 84-2-401(1) also says that any "reservation by the seller of title" is limited "in effect to a reservation of a security interest."[25] Section 2-501(1) grants the buyer of goods "a special property and an insurable interest" in the goods once they are identified to the contract. That occurs when the contract is made if the goods sold are "existing and identified."[26] In the Contract, the Trust agreed to deliver the equipment to Novak at closing in exchange for his down payment, his note, and the security agreement. Even if the Trust's right to declare the Contract null and void survived closing, it was, at best, a retained security interest in the goods—one that was and is unperfected as of January 14, 2016. The Trust's "contract terms" argument fails as a matter of law.

---

[24] KAN. STAT. ANN. § 84-2-401(1).
[25] *Id.*
[26] KAN. STAT. ANN. § 84-2-501(1)(a).

**9**

The "lease" argument is also flawed. Initially, the Trust argued that after it recovered ownership of the goods when Novak "surrendered" them, it orally leased the goods back to him for a period of years—something Novak denies. Only after the Bank asserted that an oral lease for a period of years would violate the statute of frauds, did the Trust modify its position that the lease was "year to year." There is no factual support in the record for the existence of any lease. Even if there were a lease, the Bank's security interest in the Collateral remains enforceable against the Collateral whether it is in the hands of Novak or the Trust.[27]

The "loss-payee" argument also fails. As noted above, once a secured party perfects a security interest in personal property, it has perfected its lien in that property's proceeds as well. Such proceeds include any insurance payable that is attributable to the destruction of or damage to the property. The mere fact that the Trust was also a loss-payee on Novak's insurance policy on the Collateral does not give it any greater interest in the insurance proceeds than it would have in the grinder itself. The Trust's perfection lapsed in January of 2016, before the fire destroyed the grinder and its unperfected security interest in the proceeds is junior to the Bank's perfected one. This is no different than if the grinder had been sold rather than destroyed on October 31, 2016. The Bank would have first call on the proceeds "to the extent of the value of the collateral and to the extent payable to the debtor or the secured party."[28] The outcome here should be no different.

---

[27] KAN. STAT. ANN. § 84-9-315(a)(1).
[28] § 84-9-102(a)(64)(E).

**10**

The Trust relies on the *Judah AMC* case to support its position, but the facts in that case are much different.[29] There, a car dealer sold a fleet of vehicles to a car-rental concern, taking a security in them to secure the payment. The buyer was to provide collision insurance. The dealer assigned the sale contract to a bank. Unlike Novak, the buyer did not name any loss-payees in its insurance policy. Thus, when one of the cars was damaged, the insurer paid the car-rental concern instead of the bank and the bank sued the insurer. It lost. In affirming, the Iowa Supreme Court noted that neither party gave the insurer actual notice whom to pay and that the insurer had paid the buyer when its president declared that it was the sole property of the insured. The insurer had no duty to search records to determine who might have had a security interest in the claim proceeds.[30]

The Clarks cite this case in their treatise, stating "the moral of the case is that the Article 9 secured party cannot rely on a broad reading of 'proceeds' as a substitute for a loss payee clause."[31] But, just a few sentences before, they also note that "because casualty insurance proceeds will normally qualify as identifiable cash proceeds, the secured party is fully protected if the security interest in the original collateral was perfected by a proper financing statement."[32] And, they say, "protection with respect to the insurance payout is dependent upon protection with respect to the original collateral."[33] The Trust's rights to the insurance proceeds lost

---

[29] *Judah AMC & Jeep, Inc. v. Old Republic Ins. Co.*, 293 N.W.2d 212 (Iowa 1980).
[30] 293 N.W.2d 212, 213.
[31] Barkley J. Clark and Barbara Clark, The Law of Secured Transactions, 3rd Ed., §1.108[8][b].
[32] *Id.*
[33] *Id.*

**11**

their "protection" when the Trust allowed its financing statement to lapse. The Trust's right to collect the insurance proceeds of the grinder is subordinate to that of the Bank.

Conclusion

The Trust's remaining defenses fail as a matter of law and First National Bank and Trust should be granted summary judgment finding that its security interest in the collateral Novak acquired from the Trust under the Contract (including the insurance proceeds) attached and is perfected. It is senior in priority to the Trust's now unperfected security interest in the same collateral. Ronald Novak remains the owner of the collateral. A judgment on decision will issue today.

###